IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

GREGORY JONES AND DARLENE JONES, as
successors in interest to Eric Jones;
GREGORY JONES, an individual; and
DARLENE JONES, an individual,

    Plaintiffs,

   v.

COUNTY OF DEL NORTE, CALIFORNIA, a
political subdivision of the State of
California; RAMSEY WILLIAMSON, an
individual; and DOES 1 through 10
inclusive,

    Defendants.
_____/

No. C 08-03222 CW

ORDER GRANTING IN
PART AND DENYING IN
PART DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT

    This case involves the deadly police shooting of Eric Jones following a traffic stop. Plaintiffs, the parents of the deceased, charge Defendants County of Del Norte and Del Norte County Deputy Sheriff Ramsey Williamson with violating 42 U.S.C. § 1983 and various state tort laws. Defendants move for summary judgment on all claims. Plaintiffs oppose the motion. Having considered all of the papers filed by the parties, the Court grants Defendants' motion in part and denies it in part.

BACKGROUND

    On May 16, 2008, the Del Norte Sheriff's Department received a

phone call from a concerned driver, who reported a black Ford Ranger pickup truck traveling erratically southbound on Highway 199 in Del Norte County. Eric Jones was the driver of the truck. The Sheriff's Department dispatcher notified Deputy Williamson, who was on patrol at the time, of the alleged reckless driver. Traveling northbound on Highway 199, Williamson saw Jones traveling in the opposite direction, turned around, activated his emergency lights and began to follow Jones' car.

Jones did not slow his vehicle down or make any attempt to stop. He was driving between thirty and forty miles per hour during the pursuit. While driving, Jones appeared to become very agitated, shaking his hands, his head and his whole body. It looked like he was either talking to or yelling at himself. Using his car's public address (PA) system, Williamson ordered Jones to pull over. Jones then crossed the yellow center divide lines and drove in the wrong direction for about 500 feet. There were no cars in the oncoming traffic lane at that time.

Using his car's PA system, Williamson again ordered Jones to pull over. In response, Jones put both of his arms out of the driver's side window and began shaking them. Williamson reported to dispatch that Jones was "very agitated at this time." Athey Decl., Exh. A at 575.

Deputy Carl Berry set up a tire deflation device, also known as spike strips in the highway ahead of Jones. Jones drove over the strips and Berry removed the strips from the highway. Williamson continued to follow Jones and noticed that Jones' right front tire was losing air. Jones still refused to pull over and continued to make rude and defiant gestures. Berry then drove up

behind Williamson and followed the pursuit of Jones.

His tire too flat to drive on any further, Jones rolled to a stop in the southbound lane of Highway 199 on a bridge. Williamson and Berry parked their cars next to each other, about twenty to twenty-five feet behind Jones' truck. Once the truck came to a stop, Jones immediately got out and stood by the driver's side door. Williamson and Berry stood behind their driver's side doors, drew their service revolvers and repeatedly commanded Jones to get his hands up, turn around and get on the ground. Jones did not comply with these commands. Instead, Jones took an aggressive fighting stance and made fists with both of his hands. Athey Decl., Exh. A at 655.

After Jones exited his car, Deputies noticed two dogs in Jones' car, a large black rottweiler and a small white pitbull. Williamson claims that Jones began ordering and gesturing for his dogs to move in the deputies' direction, at which point both Williamson and Berry told Jones that if he sent the dogs toward them they would shoot the dogs. Athey Decl., Exh. A at 655. The pitbull then jumped out of Jones' truck but did not exhibit any aggressive behavior. It sniffed around Berry's patrol car and then ran back into Jones' truck. Williamson maintained his focus on Jones and the rottweiler, which was now sitting in the driver's seat of the truck.

Berry was able to holster his gun and transition to his taser and he took over with the verbal commands. Athey Dec., Exh. A at 500, 511, 655. At this point, Sheriff's Deputy Joseph Garcia arrived on the scene from the northbound lane. Garcia, dressed in plain clothes, immediately exited his vehicle, deployed his baton

3

and commanded Jones to get down to the ground. Garcia was approaching Jones from behind. According to Garcia, Jones did not respond to his commands and instead told the officers to "fuck off" and to "leave him alone." Athey Dec., Exh. A at 507. Garcia slowly started to approach Jones while continuing to give commands.

At this point, Defendants' versions of the events diverge from those of other percipient witnesses. According to Defendants, once Jones noticed Garcia moving toward him, Jones took a few steps in the direction of Williamson and Berry. Jones then assumed a fighting stance, legs spread apart, with his fists clenched. Mitchell Decl., Exh. A, 64:7-13. Then, Jones whistled at his dogs and yelled, "[G]et him." Athey Dec., Exh. A at 508. The rottweiler exited Jones' car and began to "charge" Garcia. Williamson shot the rottweiler when it was approximately twenty feet from Garcia. At the time Williamson shot the rottweiler, neither Berry nor Garcia had their weapons drawn; and Jones was standing still with his hands visibly by his side.

Then Williamson turned his attention to Jones, who was approximately ten to fifteen feet away and running full speed toward Williamson, with his fists clenched, yelling, "[Y]ou motherfucker." Mitchell Decl., Exh. A, 53:13-54:6, 55:25-56:11, 91:25-92:13, 121:14-17. Williamson thought about transitioning from his firearm to a taser, but claims that he didn't have enough time to do so. Williamson started to back away from Jones and then fired two shots at Jones when he was about ten feet away. Mitchell Exh. A, 121:14-16, 151:23-25. Williamson testified that Jones "was running full board towards me. I had no doubt that if he got within striking distance of me, he would attempt to cause serious

4

bodily harm or death." Mitchell Decl., Exh. A, 121:14-16.
Williamson shot Jones in the abdomen and shoulder and Jones fell forward to the pavement approximately six to eight feet from Williamson.

Plaintiffs recount a different version of the events. Two percipient witnesses, Mark Russo and Brandon Smith, who had unobstructed views of the incident, claim that Jones never clenched his fists or took an aggressive fighting stance when he exited his car. Galipo Decl., Exh. D., Russo Dep. 103:5-12; Galipo Decl., Exh. E, Smith Dep. 74:15-75:4. Although Williamson and Garcia claim that the rottweiler charged Garcia, Russo and Smith did not see the dog run at any of the officers or see Jones gesture for the dog to attack.[1] Galipo Decl., Exh. D at 104:21-24. At most, Russo observed the dog move away from the car towards Garcia, at a speed somewhere in between a run and a walk. Galipo Decl., Exh. D at 108:20-25 (testifying "the dog did not run; the dog did not walk; it was something in the middle."); Id., Exh. E at 63:23-25 (describing the dog as "walking forwards"). Smith and Russo claim that Jones was about thirty to forty feet away from Williamson when Williamson shot the dog. Galipo Decl., Exh. D at 108:6-14; Id., Exh. E at 79:17-20.

According to Smith and Russo, after Williamson shot the rottweiler, Jones never ran at or tried to attack any of the deputies. Galipo Decl. Exh. D at 103:5-22; id., Exh. E at 74:15-

---

[1] It is not clear from the evidence how far Russo and Smith were from the shooting incident; however, Smith testified that he was too far away to hear any conversations between Jones and the officers or any commands that Jones may have given to his dogs. Galipo Decl., Exh. E at 75:12-14.

5

75:10, 76:20-77:11.  Smith testified that, once the dog was shot, Jones took only one or two steps toward the dog, not toward the officers, and had only moved a few feet before Williamson shot Jones.  Galipo Decl., Exh. E at 74:15-75:10, 76:20-77:11.  Smith also testified that it did not appear that Jones was about to injure or kill any officer at the time of the shooting.  Galipo Decl., Exh. E at 77:2-11.  Further, Garcia testified that, throughout the entire incident, "from any position that I personally was in, I would not have used deadly force."  Galipo Decl., Exh. C, Garcia Dep. 171:3-4.

The entire sequence of events, from the time Williamson initially drew his weapon on Jones until he shot Jones, took about one and one-half minutes.  Athey Decl., Exh. A at 545.

Jones' parents, Gregory and Darlene Jones, assert six causes of action against Defendants Del Norte County and Deputy Williamson.

Plaintiffs' first cause of action is charged against Williamson for violating Jones' civil rights under 42 U.S.C. § 1983, alleging excessive force in violation of the Fourth and Fourteenth Amendments of the United States Constitution.  The second and third causes of action assert a § 1983 claim against the County of Del Norte, alleging that the deprivation of Jones' constitutional rights resulted from a long-standing practice or custom which constitutes the County's standard operating procedures.  Plaintiffs' third, fourth and six causes of action are asserted against Williamson and the County under state law for assault and battery, negligence and wrongful death respectively.  Plaintiffs' fifth cause of action is a negligent training and

supervision claim against Del Norte County.

LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute. Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material. Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289. The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law will identify which facts are material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

DISCUSSION

I. Individual Liability Under 42 U.S.C. § 1983

Plaintiffs' first cause of action asserts a § 1983 claim against Williamson for unreasonable use of force. Defendants maintain that the doctrine of qualified immunity shields them from

7

liability for Plaintiffs' § 1983 claim. The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

The threshold question is whether, if all factual disputes were resolved in favor of the party asserting the injury, the evidence would show the defendant's conduct violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Id. On the other hand, if a violation could be made out on the allegations, the next step is to ask whether the constitutional right at issue was clearly established. Id. The question here is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. Id. If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate. Id.

Plaintiffs claim that Williamson is not entitled to qualified immunity because his conduct violated the clearly established Fourth Amendment right to be free from unreasonable use of force by a police officer. In "Fourth Amendment unreasonable force cases, unlike in other cases, the qualified immunity inquiry is the same as the inquiry made on the merits." Scott v. Henrich, 39 F.3d 912, 914-15 (9th Cir. 1994) (quoting Hopkins v. Andaya, 958 F.2d 881, 885 n.3 (9th Cir. 1992)).

8

Claims of excessive force which arise in the context of an arrest, investigatory stop or other "seizure" of a person are analyzed under a reasonableness standard. Graham v. Connor, 490 U.S. 386, 395 (1989). The use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment. Tennessee v. Garner, 471 U.S. 1, 7 (1985).

The question in an excessive use of force claim is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham, 490 U.S. at 397. Determining whether use of force is reasonable "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Id. at 396 (quoting in part United States v. Place, 462 U.S. 696, 703 (1983)). Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. The calculus "must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Id. at 396-97.

An officer's use of lethal force is reasonable if "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." Garner, 471 U.S. at 3. The Ninth Circuit has recognized that deadly force cases "pose a particularly difficult problem under this regime because the officer defendant is often the only

surviving eyewitness." Scott, 39 F.3d at 915. Thus, the court "must ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story--the person shot dead--is unable to testify. The judge must carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, as well as any expert testimony proffered by the plaintiff, to determine whether the officer's story is internally consistent and consistent with other known facts." Id.

Contrary to Defendants' assertions, there are several disputed material facts that prevent entry of summary judgment on the basis of qualified immunity. Drawing all reasonable inferences in favor of Plaintiffs, a reasonable jury could infer that Jones did not pose an immediate threat of death or serious bodily injury to any of the deputies or anyone else. Although Jones was fleeing from the police, during his face-to-face interaction with Williamson, Jones' hands were visible to deputies at all times, including the time of the shooting. Plaintiffs have presented evidence that the dogs exited Jones' car on their own accord and were not commanded to attack. While Defendants claim that Jones charged Williamson after the dog was shot and that Jones was within steps of physically attacking Williamson when Williamson discharged his weapon, Plaintiffs have presented admissible evidence that Jones simply took two steps towards his dog after it was shot and that he was approximately twenty-five to thirty-five feet away from Williamson at the time he was shot. At no point did Jones make a furtive movement which could be interpreted as reaching for a weapon. At the time of the shooting, the only other two officers

at the scene, Garcia and Berry, did not feel threatened enough to draw their guns. In sum, under the reasonable inferences that can be made from the version of facts presented by Plaintiffs, Williamson is not entitled to qualified immunity. Therefore, the Court denies Defendants' summary judgment motion on the § 1983 claim against Williamson.

II. Municipal Liability Under 42 U.S.C. § 1983

Plaintiffs' second cause of action asserts a § 1983 Monell claim against Del Norte County. A municipality may be liable under § 1983 when the enforcement of a municipal policy or custom was the moving force behind the violation of a constitutionally-protected right. Monell v. Dep't of Social Services, 436 U.S. 658, 663-64 (1978). Plaintiffs claim that the policy in question is the County's failure to act. "To impose liability against a county for its failure to act, a plaintiff must show: (1) that a county employee violated the plaintiff's constitutional rights; (2) that the county has customs or policies that amount to deliberate indifference; and (3) that these customs or policies were the moving force behind the employee's violation of constitutional rights." Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006).

Here, even viewing the facts in the light most favorable to Plaintiffs, their Monell claim fails. Plaintiffs have not presented any evidence that the County had a custom or policy that amounted to deliberate indifference to situations involving the use of deadly force. Further, Plaintiffs have not created a triable issue of fact as to whether the County was deliberately indifferent to officer training in general. In contrast, the County presented

evidence of the training that each deputy receives, which exceeds the standards established by the California Commission on Peace Officers Standards and Training (POST). The POST curriculum includes training in the use of force and firearms and all peace officers employed by the County are required to undergo a minimum of twenty-four hours of Advanced Officer Training every two years. Moreover, the County's written policy regarding the use of force conforms to Ninth Circuit law: "A deputy may use deadly force to protect himself/herself or others from what he/she reasonably believe would be an imminent threat of death or serious bodily harm." Athey Decl., Exh. A at 554. In sum, Plaintiffs have not created a triable issue of fact concerning Del Norte County's § 1983 liability under Monell. Therefore, the Court grants Defendants' summary judgment motion on this claim.

III. State Tort Liability

Plaintiffs sue Del Norte County for negligent training and supervising; and they sue both Del Norte County and Williamson for assault and battery, negligence and wrongful death.

    A.   Negligent Training and Supervising

Plaintiffs assert that Del Norte County "breached its duty of care by failing to train and supervise Deputy Ramsay Williamson to ensure that he carried out his duties in a lawful manner." Compl. ¶ 51. However, California Government Code § 815(a) provides that "except as otherwise provided by statute, [a] public entity is not liable for an injury, whether such injury arises out of any act or omission of the public entity or a public employee or any other person." Thus, direct tort liability against a municipality must be authorized by statute. Further, California law does not provide

12

a basis to hold a municipality directly liable for its alleged "negligence in the selection, training, retention, supervision, and discipline of police officers." Munoz v. City of Union City, 120 Cal. App. 4th 1077, 1112 (2004).

Plaintiffs argue that the County may be vicariously liable for the acts of its employees under California Government Code § 815.2(a). This section provides, "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative." Cal. Gov't Code § 815.2(a). In order for the County to be liable for negligent supervision, Plaintiffs must demonstrate that a specific employee is liable for negligent supervision. While "public entities always act through individuals, that does not convert a claim for direct negligence into one based on vicarious liability." Munoz, 120 Cal. App. 4th at 1112. Plaintiffs have not presented any direct evidence that Del Norte County's employees negligently supervised and trained other employees.

B.  Assault and Battery, Negligence and Wrongful Death

Defendants' only argument in favor of dismissing Plaintiffs' state law claims for assault and battery, negligence and wrongful death is that there are no triable issues of material fact in support of Plaintiffs' § 1983 excessive force claims. Because the Court concludes that Plaintiffs' § 1983 excessive force claim will proceed to trial, Defendants' argument is not well-taken. Defendants do not address these tort claims in their reply brief. Thus, Defendants have not proved that there are no triable issues

of material fact concerning Plaintiffs' tort claims for assault and battery, negligence and wrongful death. Accordingly, the Court denies Defendants summary judgment on these claims.

CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' summary judgment motion (Docket No. 44). Plaintiffs' § 1983 claim against Williamson and their state tort claims for assault and battery, negligence and wrongful death against Williamson and Del Norte County will proceed to trial. However, the Court notes that the assault and battery, negligence and wrongful death claims against Del Norte County may be pursued only through a theory of vicarious liability, not direct liability. See Cal. Gov't Code § 815.2(a).

IT IS SO ORDERED.

Dated: JAN - 7 2010

CLAUDIA WILKEN
United States District Judge